Filed 4/13/15  P. v. Wynne CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B251478 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA063841) |
| v. | |
| JOHN FARRELL WYNNE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph A. Brandolino, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

The question raised by this appeal is whether Penal Code section 654[1] bars sentencing of a defendant for both criminal threats and stalking of a victim when the stalking convictions were based in part on the charged making of criminal threats. We find that section 654 is not a bar where there was substantial evidence to support the stalking charges excluding consideration of the criminal threats charged separately.

John Farrell Wynne appeals from a judgment of conviction entered after a jury trial. The jury found him guilty on two counts of making criminal threats against Julia Knox (§ 422; counts 1 & 2), one count of stalking Knox in violation of a court order (§ 646.9, subd. (b); count 3), and one count of stalking Knox (§ 646.9, subd. (c)(2); count 4). The jury also found Wynne guilty of stalking Emily Stuhlbarg (*ibid*.; count 5) and Richard Norene (*ibid*.; count 6), and making criminal threats against Stuhlbarg (§ 422; counts 7, 9 & 11) and Norene (*ibid*.; counts 8, 10 & 12).

Following a bifurcated hearing, the trial court found true the allegations Wynne suffered a prior conviction of a serious felony (§§ 667, subds. (a)(1), (b)-(i), 1170.12) and served three prior prison terms (§ 667.5, subd. (b)). The court found section 654 inapplicable, and sentenced Wynne to consecutive terms on the stalking and criminal threats counts for an aggregate term of 32 years and 8 months in state prison.[2]

We affirm.

---

[1]    All further statutory references are to the Penal Code.

[2]    The court did apply section 654 to count 3, which alleges stalking of Knox in violation of section 646.9, subdivision (b) (stalking), during the same time period as count 4, which alleges violation of section 646.9, subdivision (c)(2) (stalking with priors). Because the court stayed the sentence on count 3, sentencing on that count is not challenged on appeal.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.** *Charges Against Wynne*

The information charges Wynne with two counts of making criminal threats against Knox occurring on October 19 and November 11, 2009 (counts 1 & 2), and two counts of stalking Knox during the period from August 25, 2009 to November 11, 2009 (counts 3 & 4). The information also charges Wynne with two counts of stalking as to Stuhlbarg and Norene occurring from October 27, 2009 to March 16, 2010 (counts 5 & 6). The information charges Wynne with six counts of making criminal threats against Stuhlbarg and Norene based on three incidents occurring on November 23, December 13, 2009 and February 15, 2010 (counts 7-12).[3]

We will discuss the underlying conduct below, in chronological order.[4]

**B.** *Stalking and Criminal Threats Against Knox: Counts 1 to 4*

1. *Background Facts From April 28, 2006 to October 25, 2007 (Not Charged)*

Knox is a Los Angeles County Deputy Public Defender who represented Wynne in a criminal case in 2001. On April 28, 2006, Wynne left a voice message for Knox at her work, identifying himself by name and asking for information about an old case. When Knox returned his call, he asked her inappropriate personal questions. Knox told him she would only answer questions about a case and assist him in a legal capacity, then she ended the call. Wynne left a message for Knox later in the day, apologizing for having asked questions that Knox said were inappropriate, and asking about some

_____

[3]    Counts 5 and 6 allege the same acts of stalking as to Stuhlbarg in count 5 and Norene in count 6. The remaining counts likewise allege the same criminal threats as to Stuhlbarg (counts 7, 9, & 11) and Norene (counts 8, 10, & 12).

[4]    The information does not allege the counts in chronological order. For example, count 1 alleges a criminal threat on November 11, 2009, and count 2 alleges a criminal threat on October 19, 2009.

"losses." Knox believed that Wynne wanted to hire her to represent him, and did not return his call.

Knox received voice messages from Wynne on May 4, 5, and 11, 2006, in which he identified himself as "Mr. Wynne," "Spyder," and "the worldwide shot [c]aller." At times he spoke in the third person, pretending to be someone else. Knox later learned that Wynne had been arrested on June 3, 2006. Another deputy public defender advised her that at the time of his arrest Wynne said Knox was his wife. This caused her concern.

Knox received a letter from Wynne dated July 16, 2006, addressed to her at the Van Nuys courthouse. In the letter, Wynne said he knew he and Knox were not married because he had not seen her in 10 years. He said he had been robbed of $3,000 and owed Knox money. He said his cousin was a Navy SEAL, he wanted Knox to visit him, and he knew Knox could not be his lawyer because of a conflict of interest. He said he was on suicide watch; he had been raped, beaten, and starved while in custody, and he was afraid. He said he wished Knox was well and "still alive," and he loved her "no matter what" because she was "the smartest woman in the entire world." He also told Knox that the Crips and Bloods had elected him to be a "shot caller," but he might refuse so he could be the "shot caller" for the Navy SEALS instead. He ended the letter saying, "Remember, you are the boss, not me. You're in charge of my life, not me, love Spyder."

In a letter dated July 18, 2006, Wynne wrote to Knox about the Navy SEALS and being tortured. Knox received two envelopes postmarked July 24. The first contained a letter, a page from a police report in which Wynne identified Knox as his wife, and some jail papers. It also contained a note stating that Judge Rubin at the Criminal Courts building would be killed, Deputy Astorga would be killed on Christmas eve for Knox's safety, and another deputy would be killed on Christmas. Knox did not know Judge Rubin or Deputy Astorga. The second envelope contained an identification card. Wynne left Knox a voice message on August 2, 2006 stating that he was at the courthouse and wondering if she had received the letters he sent. He said he would call her later.

4

Wynne left five more voice messages for Knox between October 16 and December 11, 2006. He again identified himself as either "Mr. Wynne" or "Spyder." In one message, he said he was going to "Patton" [mental hospital] but would be "on the streets soon," and he hoped she was well. In another, he referred to himself as her husband and said he loved her. In another, he told her not to send money because he had received money from his father as an inheritance and planned to buy her a holiday gift worth about $45,000. He also said he would see her very soon at the Van Nuys courthouse.

Wynne left two voice messages for Knox in March 2007, identifying himself as "Spyder." In the first, he said he loved her but would back off if she was involved. In the second, he said he would be back on the streets soon and wanted to talk to her about the law.

Knox received another voice message from Wynne on April 11, 2007, in which he said he missed her "big, beautiful purple dress" and "big, beautiful blond hair." Knox said the way he drew out his words "was creepy," and she perceived that his message had sexual undertones. In subsequent messages, he said he loved Knox, was coming to see her when he got out, and he knew where she worked. Wynne's messages were becoming more overtly sexual and more disconcerting to Knox.

Between April 13 and July 7, 2007, Wynne left Knox over two dozen voice messages, talking about how he loved her and was going to visit her when he got out. In the two messages he left on July 7, Wynne said he loved Knox, wanted to wrestle with her, liked her bending over in front of him, masturbated thinking about her, wanted to get her in a pool or Jacuzzi, and was saving himself for her.

On July 24, 2007, Knox received a card reading: "I'll be back in Beverly Hills in less than 90 days. Thank God. . . . 'My release date is 10-05-07.' If you're single, I would like to be your friend. I don't mess with married or involved women. I don't want to disrespect your husband or boyfriend. I like to swim and play Twister and Frisbee at the beach. Hope you are okay, love, Spyder, the worldwide shot caller."

5

In August and September 2007, Knox received more voice messages from Wynne talking about his release date, identifying himself as her "wannabe" husband and asking her if she wanted to get married and where she wanted to live, calling her his wife, and identifying her as Julia Knox Wynne. He said he was a worldwide shot caller affiliated with the Navy SEALS. He told her he wanted her to buy a bikini and would see her in 280 hours.

In September 2007 Wynne sent Knox a pamphlet on which he wrote at the bottom, "Julia loves Spyder." Later that month, Knox received a letter with pages torn from a Cosmopolitan magazine, including one showing a woman in stockings and garters with visible panties with the caption at the bottom, "better sex." These letters caused Knox to have "great concern" for her safety.

At the beginning of October 2007 Knox spoke to her supervisor, James Coady, about the situation. Coady alerted building security and had Wynne's photograph posted at the registration desk. Knox obtained a temporary restraining order, which Coady served on Wynne. Coady told Wynne that his contact with Knox was inappropriate and was scaring her. He also warned Wynne of the consequences of continuing with his inappropriate conduct.

On October 25, 2007 the restraining order was made permanent through October 2010. A copy was served on Wynne. He nonetheless continued to contact Knox, including written mail and voice messages.

2. *Stalking From August 25, 2009 to September 28, 2009 (Counts 3 & 4)*

On August 25, 2009 while the restraining order was in place, Wynne left a message for Knox in which he sang and rapped. He called three more times and spoke to Meghan Peterson, who was at the receptionist's desk in the Public Defender's Office in Van Nuys. In the first call, he identified himself as John Wynne and asked to speak to Julia Knox; Peterson put the call through and then called Coady. Wynne called again less than a minute later and asked for Knox but did not identify himself. Coady had Peterson connect the call to him, but Wynne hung up. Wynne called a minute later and again

6

asked for Knox. Peterson recognized his voice and asked if he had a case number; Wynne asked if she had a case number and hung up.

The following day, August 26, Peterson and Pam Sommers saw Wynne in the office lobby. Sommers heard him identify himself as John and ask for Julia Knox. When Knox learned he had been at the office looking for her, she became more fearful for her safety. Wynne refused to leave, and Knox's office contacted the Los Angeles County Sheriff's Department. Sheriff Deputy Donald Robertson responded to the call that day, and observed Wynne in the lobby with his backpack and other possessions strewn about. Robertson detained Wynne until the police arrived and Wynne was arrested. Robertson notified Knox that Wynne had been arrested for violating the protective order. Criminal charges were filed against Wynne, and another restraining order was issued, effective through September 2012.

While this restraining order was in place, on September 28, 2009, Wynne left a message for Knox saying that he had been released and apologizing for any misbeliefs Knox had about him. He said he would always protect her and love her.

### 3. *Criminal Threats on October 19, 2009 (Count 2)*

On October 19, 2009 Knox received a voice message from Wynne stating, "Fuck you, bitch." He called again and hung up when she didn't answer. In a third call, he stated, "I'm going to fucking kill you when I get out or I'll pay someone to do it for me. You're a fucking piece of shit." A fourth call was another hang up. Knox also received four other inmate calls. Knox recognized Wynne's voice in two of the calls; the other two were hang-ups.

### 4. *Stalking From November 6, 2009 to November 11, 2009 (Counts 3 & 4)*

Wynne continued to call Knox, leaving over 30 voice messages between November 6 and 11, 2009. In some of these calls, the speaker (sometimes identifying himself as Timothy) said Wynne was not a threat to society, his feelings were hurt because Knox took out a restraining order on him, Wynne wanted a "fair fight" with

7

Knox in the ring, he wanted her to visit him and bring money, glasses and magazines, and he wanted her to call his trustees and have them bring him money.[5] He said Wynne's calls were being blocked "and he's being raped and tortured in jail."

The speaker said Wynne did not know if he wanted to marry Knox because he had "never seen her naked" and "he doesn't know if they're compatible." In one call, he told Knox to come to jail "dressed nicely" and to say she was there to pick up John Wynne.

On November 10 Wynne called Knox pretending to be "Timothy," saying that he was not a threat to society and that the restraining order was based on lies. Wynne told Knox she was driving him crazy, she got him arrested and he was almost killed by a deputy. Wynne said, "he does want revenge . . . . But, he doesn't want to kill you. He doesn't want you to go to jail. His revenge on you is he just wants you to put head gear on a mouthpiece, boxing gloves on, and go into a ring with her and fight fairly, you know. [¶] And once he feels you got enough punishment . . . , then, that'll be it. But, if you don't agree to a mutual fight, then, there won't be one. . . ."

### 5. *Criminal Threats on November 11, 2009 (Count 1)*

On November 11, 2009 Knox received a number of voice messages in which she recognized Wynne's voice. At 9:12 a.m., "Timothy" called asking Knox to bring Wynne glasses. At 9:17 a.m., "Timothy" called again and left a rambling message asking for glasses and $4,000, which Wynne needed to prevent someone from being killed. At 9:45 a.m., "Timothy" called asking Knox to come to jail to "talk to Mr. Wynne about this issue" and to bring glasses and magazines. He also mentioned Wynne marrying another woman because he needed visits in jail and prison.

At 11:54 a.m. on November 11, 2009, a speaker, who did not identify himself, left Knox a rambling message in which the speaker talked about someone being killed, Wynne being rich, and Wynne wanting Knox to visit him and bring glasses and money.

---

5    The reference to trustees appears to refer to Stuhlbarg and Norene, who were the trustees of a special needs trust set up for Wynne's benefit.

The speaker said Knox was obsessed with Wynne. At 1:52 p.m., the unidentified speaker said that Wynne wanted Knox to come and explain the law to him. He mentioned his cousin chopping people's heads off, the Crips and Bloods getting involved, and that Knox needed to figure out a way to get Wynne released.

A voice message left at 2:29 p.m. stated that "Mr. Wynne checked his account. And he's only got $55 in there. So, obviously you didn't bring anything down here, bring any glasses or anything. Uh, he says that when his cousin finds out about this shit, even if he's gonna tell his cousin not to do it, he's gonna end up chopping your fucking head off while you're still alive and killing you and—and your trustees—both of them— 'cause you haven't done shit to fucking help him."

At 2:34 p.m., the speaker left Knox a voice message stating that she was partially responsible for Wynne being in jail, and "the least you could fucking do is make sure that he's got money on his books. I mean, uh, you're not visiting him in there either, which he wants you to do. And don't think that his cousins that cares about him, but, when he finds this shit out, he'll do some tortuous-ass fucking shit to you. And he will kill you and your whole fucking family. You better think about that, too." In the final call, at 3:02 p.m., the speaker said, "You need to come here by ten o'clock tonight and put a thousand dollars on this one's books or the inmate said they were gonna send people from the streets down to your work and have you killed. That's about it."

6. *Stalking From December 20, 2009 to October 2011 (Not Charged)*

Knox received a letter dated December 20, 2009 purporting to be from Wynne's cellmate. The letter expressed concern for Wynne and described him as being "sorrowful, lamenting, and in an obsessive state of mind." The letter said Wynne needed "Julia" to visit him. It appeared to Knox that the letter was from Wynne himself.

In March 2010 Knox received an envelope containing numerous scraps of paper. There were some that had names and the number 187 (Penal Code section for murder) on them; one said, "Crips, Bloods, 187." One paper said, "I hope you're doing well. I don't want to fist fight you. I have a life sentence now."

9

Knox received a number of voice messages from Wynne in March and April 2010, with many requests that she come visit him. In one he identified himself as her husband. Many times Wynne called Knox, said "bitch" and hung up. The voice messages continued through October 2011.

## C. *Stalking and Criminal Threats Against Stuhlbarg and Norene: Counts 5 to 12*

### 1. *Stalking From October 27, 2009 Through End of 2009 (Counts 5 & 6)*

Stuhlbarg and Norene were trustees of a special needs trust created in 2008 for Wynne's benefit. They disbursed funds from the trust to supplement Wynne's public assistance benefits. In 2009 Wynne began sending them letters from jail and leaving them voice messages telling them how dissatisfied he was with their services. He made hundreds of phone calls, often demanding that Stuhlbarg and Norene meet him and give him money. A number of calls pertained to Stuhlbarg's attempts to get Wynne into a psychiatric program; he would first agree but then refuse.

### 2. *Criminal Threat on November 23, 2009 (Counts 7 & 8)*

In a letter postmarked November 23, 2009, Wynne wrote to Stuhlbarg and Norene: "I need new trustees because you are making me want to kill you."

### 3. *Criminal Threat on December 13, 2009 (Counts 9 & 10)*

In a letter dated December 13, 2009 addressed to "Doctor Emily," Wynne wrote: "I will get rid of you and get other trustees, and no matter what, my cousin might kill you and Richard, even if I tell him not to, because he's a government official."

### 4. *Stalking From January 3, 2010 to February 12, 2010 (Counts 5 & 6)*

Wynne wrote Stuhlbarg and Norene again on January 3, 2010, expressing his unhappiness at the amount of "canteen" money that had been sent to him in jail. Stuhlbarg and Norene had sent him about $16,000 in "canteen" money. Wynne wrote: "I seriously contemplate actually killing you half of the time because, half of the time,

you act incompetent or lazy, and if you don't want to do a great job as trustees, then let me know. I can get rid of you and hire someone else." He also wrote: "What I really want to do is beat your mother fucking asses so bad because you don't listen and you just keep ignoring me."

In a letter addressed to "Doctor Emily or Richard" dated February 12, 2010, Wynne wrote that he would come to their office after he was released.

5. *Criminal Threats on February 15, 2010 (Counts 11 & 12)*

In a letter dated February 15 and postmarked February 19, 2010, Wynne told Stuhlbarg and Norene to send him $5,000 "or the Blacks told me they will kill you and your whole organization." He also wrote: "I'm pressing criminal charges on Emily Stuhlbarg and Richard Norene when I get out of prison on 3-16-10 for child molestation, rape, neglect, murder, and kidnapping. See you in hell." He added: "I was raped and almost killed in county jail, and Emily allows this, and that is why the Blacks want to kill her. I hope." He wrote 187 on the letter and circled it.

6. *Continued Stalking From Early 2010 to March 16, 2010 (Counts 5 & 6)*

In late 2009 or early 2010 Wynne came to the office of Stuhlbarg and Norene. He charged into the office head first, pushing Norene aside, sat down in a chair and refused to leave. His actions scared Norene, Stuhlbarg and the office staff. Norene called the police, who escorted Wynne out of the office.

On March 11, 2010, Stuhlbarg and Norene obtained a restraining order against Wynne. They also arranged to have the special needs trust transferred to new trustees. They were afraid of Wynne and believed he might appear at their office without warning and demand money. The office staff was afraid of Wynne as well.

Wynne wrote to Stuhlbarg on March 16, 2010, telling her to "[s]end my money order today, you mother fucking bitch." He told her, "I will be getting new trustees to replace you, and you will be put in jail, you piece of shit, mother fucking bitch, fuck

11

you." He told her to stop avoiding him and added, "I will be at your office when I get out, you fucking bitch."

### D. *Jury Trial and Verdicts*

The prosecutor presented her case through the testimony of Knox, Stuhlbarg and Norene, as well as other witnesses to the events. Additionally, letters and transcripts of telephone calls from Wynne described above were admitted as exhibits.

In her closing argument, the prosecutor first addressed the evidence as to the criminal threats against Knox. She then argued that the charges of stalking Knox "encompass the defendant's threat to Ms. Knox." She explained that "the stalking counts—the way it's charged, it's only from August 2009 through November of 2009, but you can consider all of the facts. Same as with the threat, you can consider that for stalking."[6]

After describing the threat to the victim required for a stalking conviction, the prosecutor told the jury, "let's say [Wynne] never made those threats that we saw in counts one and two but incessantly called [Knox], he sent all those letters, he didn't follow the orders of the court with the restraining orders, that could still be stalking. But, here, we even have the threats. We have . . . direct threats on their face. It's even easier to prove the stalking in this case."

As to Stuhlbarg and Norene, the prosecutor again first discussed the individual criminal threats. She then argued, "All of this behavior, the . . . November 23rd, '09,

---

[6] While the jury may have considered the criminal threats in deciding whether to convict Wynne of stalking, as we discuss below, it is a separate inquiry whether Wynne should be sentenced for both crimes, which determination rests with the trial court. (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340 ["in the absence of some circumstances 'foreclosing' its sentencing discretion . . . a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts"]; *People v. Chapman* (1968) 261 Cal.App.2d 149, 180 ["since sentencing is a court function, the court and not the jury must determine divisibility of the offense for sentencing purposes"].)

through 3-16-10 is all stalking. . . . [¶] All of that together comprises a credible threat. There were direct threats, and all of the letters in total plus the phone calls and the physical altercations with Mr. Norene—all of that comprises stalking in violation of Penal Code section 646.9."

The jury returned guilty verdicts on all counts. As noted above, the trial court found true the allegations Wynne suffered a prior conviction of a serious felony and served three prior prison terms.

**E.** *Sentencing*

The trial court denied Wynne's motion to strike his prior serious felony conviction. The court selected count 4 for stalking Knox (§ 646.9, subd. (c)(2)) as the base term and imposed the upper term, doubled as a second strike (§§ 667, subds. (a)(1), (b)-(i), 1170.12), for a term of 10 years. The court stayed the sentence on count 3 for stalking Knox in violation of a court order (§ 646.9, subd. (b)) under section 654, as punishment for the same conduct alleged in count 4.

On the remaining counts for making criminal threats against Knox, Stuhlbarg and Norene (§ 422) and stalking Stuhlbarg and Norene (§ 646.9, subd. (c)(2)), the court imposed consecutive terms of one-third the middle term, doubled under the three strikes law, for an additional 14 years and 8 months. The court imposed five years for the prior serious felony conviction (§ 667, subd. (a)) and one year for each of three prior prison terms (§ 667.5, subd. (b)) for an additional eight years. The court sentenced Wynne to a total aggregate term of 32 years and 8 months in state prison.

## DISCUSSION

Wynne contends the criminal threats were part of the "course of conduct" of the charged stalking counts, and the trial court therefore was required to stay the sentences on either the criminal threats counts or the stalking counts under section 654. We disagree.

13

**A.** *Section 654 Bars Multiple Punishment For an Indivisible Course of Conduct with a Single Objective*

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The question whether section 654 applies in a given case is one of fact for the trial court, which is vested with broad latitude in making its determination. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.) "On this issue, we review the court's explicit or implicit factual resolutions for substantial evidence. [Citations.]" (*People v. McCoy*, *supra*, 208 Cal.App.4th at p. 1338.) "We review the trial court's determination in the light most favorable to the [People] and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143; accord, *Ortiz*, *supra*, at p. 1378.)

Our Supreme Court has stated: "The test for determining whether section 654 prohibits multiple punishment has long been established: 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.] . . . We noted, however, that cases have sometimes found separate objectives when the objectives were either (1) consecutive even if similar or (2) different even if simultaneous. In those cases, multiple punishment was permitted. [Citation.] . . . [¶] Section 654 turns on the *defendant's* objective in violating both provisions. . . ." (*People v. Britt* (2004) 32 Cal.4th 944, 951-952, fn. omitted [finding section 654 barred punishment for violation of two sex offender registration requirements for single act of moving without re-registering]; accord, *People v. Ortiz*, *supra*, 208 Cal.App.4th at pp. 1377-1378 [finding section 654 did not bar sentencing for firearm possession and kidnapping using same firearm where different objectives].)

14

Although the courts have not addressed the application of section 654 in the context of stalking and criminal threats committed during a single time period, the courts have considered application of section 654 in analogous contexts. Our Supreme Court considered section 654 in the sex offense context in *People v. Perez* (1979) 23 Cal.3d 545, 553-554, finding that the defendant could be separately punished for oral copulation and sodomy committed as part of one 45 to 60 minute course of conduct that also included rape of the victim.[7] The defendant had argued that he could only be sentenced for one of the crimes because he had a single criminal objective to obtain sexual gratification. The court rejected this argument holding: "A defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act. We therefore decline to extend the single intent and objective test of section 654 beyond its purpose to preclude punishment for each such act." (*Id.* at p. 553.) Further, the court held that because "[n]one of the sex offenses was committed as a means of committing any other, none facilitated commission of any other, and none was incidental to the commission of any other," section 654 did not apply. (*Id.* at pp. 553-554.)

In *People v. Harrison* (1989) 48 Cal.3d 321, 336, the court declined to apply section 654 to a sexual attack over a 7 to 10 minute period in which the defendant inserted his finger into the victim's vagina three separate times, separated by other violent acts by the defendant. (*Id.* at pp. 325-326.) The court affirmed the sentencing of defendant to three consecutive terms for each crime of sexual penetration, holding that to apply section 654 on the basis that the sexual acts were all the same and done in sequence

---

[7]    In contrast to the sex offenses at issue in *Perez*, section 654 is not an issue in cases involving continuous sexual abuse of a child because multiple convictions are prohibited. (*People v. Johnson* (2002) 28 Cal.4th 240, 243-244, 248.) Section 288.5, subdivision (c), specifically provides that "[n]o other act of substantial sexual conduct . . . involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative." The stalking statute, section 646.9, contains no similar prohibition.

15

"would mean that 'once a [defendant] has committed one particular sexual crime against a victim he may thereafter with impunity repeat his offense,' so long as he does not direct attention to another place on the victim's body, or significantly delay in between each offense. [Citation.]" (*Id*. at p. 337.)

In the context of alleged criminal threats, this district in *People v. Felix* (2001) 92 Cal.App.4th 905, 915, similarly found that section 654 did not bar punishment for two separate criminal threats made on the same day when they were made at different times and places, holding: "'Section 654 prohibits multiple punishment for an indivisible course of conduct . . . .' [Citation.] But multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm. [Citations.] 'Separate sentencing is permitted for offenses that are divisible in time . . . .' [Citation.]" (*Ibid*.) This is in contrast to the facts in *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1346, relied upon by Wynne, in which the court held that section 654 applied to a single threat that was charged as two separate crimes—a criminal threat and attempting to dissuade a witness from testifying.

In this case, as in *Perez*, *Harrison* and *Felix*, the acts that constituted criminal threats can be separated from Wynne's course of conduct in stalking his victims that occurred on other dates. To hold that Wynne cannot be sentenced for the criminal threats if they chronologically occur within a lengthy period of stalking would allow him, as the court in *Harriso*n noted, to act with impunity once he committed sufficient acts of stalking to constitute a crime.

Whether section 654 applies where the defendant commits multiple crimes simultaneously or over the course of the same time period has also been addressed in the firearm and drug possession context. For example, in *People v. Ortiz, supra*, 208 Cal.App.4th at p. 1358, the defendant was convicted and sentenced for possession of a firearm by a felon and carrying a firearm in a vehicle, as well as kidnapping during a carjacking in which he personally used a firearm. The court rejected the defendant's argument that the firearm possession charges should have been stayed, finding that there

16

was substantial evidence that the defendant arrived at the scene of the kidnapping already possessing the weapon, and therefore he could be sentenced on both. (*Id.* at p. 1379.)

On this basis, the court in *Ortiz* found that the defendant "harbored a separate intent and objective" with respect to the firearm possession and kidnapping for robbery counts. (*People v. Ortiz*, *supra*, 208 Cal.App.4th at p. 1379; accord, *People v. Jones*, *supra*, 103 Cal.App.4th at pp. 1145, 1147-1148 [section 654 did not bar sentencing for felon in possession of firearm and shooting at inhabited dwelling because defendant necessarily had firearm before he shot at house]; see also *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1413 [section 654 did not bar multiple punishment where evidence supported a justifiable inference "that defendant's possession of the weapon was not merely simultaneous with the robberies, but continued before, during and after those crimes"].)

In *People v. Moseley* (2008) 164 Cal.App.4th 1598, the defendant was convicted of possession of methamphetamine for sale and of maintaining a place for selling a controlled substance. He claimed that the sentence for the latter offense should have been stayed under section 654, because the two offenses arose from a single criminal objective and were committed during the same time period (and one search). (*Id.* at p. 1599-1600.) The court found substantial evidence to support the trial court's finding of two separate objectives, first, to maintain his apartment to sell his methamphetamine on an ongoing basis and, separately, his objective to sell the nine bags of drugs in his possession on the day of his arrest. (*Id.* at p. 1604; see also *In re Adams* (1975) 14 Cal.3d 629, 636 [where defendant transports a quantity of drugs and sells only a portion of that quantity, defendant may be punished for both selling and transporting drugs].) Similarly, in this case, the fact that acts of stalking preceded and followed the criminal threats does not mean that section 654 applies, as long as the crime of stalking is separately proven.

The cases relied upon by Wynne are distinguishable. In *People v. Lewis* (2008) 43 Cal.4th 415, 519, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919-920, the court applied section 654 to bar multiple punishment for the crimes of kidnapping for robbery and robbery where both crimes were committed with the single

17

objective of taking the victims' cars and taking cash from their ATMs. In *People v. Liu* (1996) 46 Cal.App.4th 1119, 1135-1136, the court found section 654 applied to bar punishment for the crime of possession of a silencer where the defendant purchased the silencer as part of a conspiracy to kidnap and murder the victims, and was the overt act necessary for the conspiracy.[8]

It is likewise a different situation where a defendant is convicted for two crimes arising from a single act, as to which section 654 applies. In his reply brief, Wynne relies upon *People v. Mesa* (2012) 54 Cal.4th 191, 200, in which the court found that section 654 applied because the same act—shooting the victim—was punishable as two crimes, an assault with a firearm and actively participating in a street gang.[9]

The question before us is whether there was substantial evidence of stalking to support that crime if the criminal threats are not considered as part of the course of conduct. We find on the facts here, with multiple acts of harassment and threats over a two-and-a-half month period for Knox and a four-and-a-half month period for Stuhlbarg and Norene, excluding the acts charged in the criminal threats counts, there is substantial evidence to support the stalking counts. On this basis we find that section 654 does not bar sentencing for both the stalking and criminal threats counts.

---

[8] Wynne also relies on *People v. McPheeters* (2013) 218 Cal.App.4th 124, but the discussion of whether the misdemeanor counts of disobeying a court order should have been stayed under section 654 where defendant was also convicted of stalking is unpublished and cannot be cited. (Cal. Rules of Court, rule 8.1115, subd. (a).)

[9] The court applied the same analysis to the crimes of being a felon in possession of a firearm and the gang crime, finding section 654 applied. (*People v. Mesa, supra*, 54 Cal.4th at p. 200.)

**B.** *There Was Substantial Evidence of Stalking Excluding Consideration of the*
*Charged Criminal Threats*

    1. *Elements of Crime of Stalking*

The elements of the crime of stalking are: "(1) repeatedly following or harassing another person, and (2) making a credible threat (3) with the intent to place that person in reasonable fear" for his or her safety. (*People v. Ewing* (1999) 76 Cal.App.4th 199, 210.)[10] A credible threat is "a verbal or written threat . . . or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety . . . and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety . . . ." (§ 646.9, subd. (g).)[11]

Section 646.9 applies to behavior that "harasses," as defined to mean, "a knowing and willful course of conduct directed at a specific person that seriously alarms,

---

[10]    Although *Ewing* refers to reasonable fear "of death or great bodily injury" (*People v. Ewing*, *supra*, 76 Cal.App.4th at p. 210), section 646.9 has been amended to require only that the victim fear for his or her "safety" (*People v. Borrelli* (2000) 77 Cal.App.4th 703, 719-721). Section 646.9, subdivision (a), now provides: "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking . . . ."

[11]    Stalking includes conduct that does not rise to the level of a criminal threat. Under section 422, a person is guilty of making a criminal threat if (1) he "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person"; (2) he made the threat "with the specific intent that the statement . . . be taken as a threat, even if there is no intent of actually carrying it out"; (3) the threat was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat"; (4) the threat caused the person threatened "to be in sustained fear for his or her own safety . . ."; and (5) the fear was reasonable under the circumstances. (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228; *People v. Wilson* (2010) 186 Cal.App.4th 789, 805.)

annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (*Id.*, subd. (e).) Further, the statute defines "course of conduct" as "two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." (*Id.*, subd. (f).)

The courts have found sufficient evidence of a credible threat to support the crime of stalking in cases where, as here, the defendant makes repeated expressions of inappropriate affection for the victim, the victim makes clear she is not interested, and the defendant by his conduct shows that he can harm the victim if necessary to gain her affection. (See, e.g., *People v. Uecker* (2009) 172 Cal.App.4th 583, 594-595; *People v. Halgren* (1996) 52 Cal.App.4th 1223, 1230-1231.)

In *People v. Uecker*, *supra*, 172 Cal.App.4th at pp. 594-595, over a seven month period defendant followed victim M., placed notes to her on her car, positioned himself in his car so he could see her workplace entrance, got mad when she made clear she was not interested in him, called her an "immature trouble making brat," and asked her "what he had to do to get a call from a beautiful woman." The court found sufficient evidence of a credible threat to support the crime of stalking, holding, "[h]is persistence lasted seven months with no signs of abating, his last conversation with M. and his last note to her evidenced hostility toward her, and his final action of positioning himself where he could see her comings and goings at work signaled he was not going to take no for an answer." (*Id.* at p. 595.)

In *Halgren*, the defendant met the victim at the grocery store and attempted to start a relationship with her, which she repeatedly rejected. (*People v. Halgren*, *supra*, 52 Cal.App.4th at pp. 1226-1227.) The court found evidence the defendant repeatedly called the victim, demanding that she speak with him even after she indicated she was not interested, told her "she would be sorry she had been so rude," came to her office when she was not there, watched people leave her building, and told her that "she would pay for her rudeness and he would 'fix her' or 'fix this.'" (*Id.* at p. 1233.) The court held: "These statements were a credible threat with a clear intent to place her in fear for her

20

safety. Coupled with the repeated harassing telephone calls, they constitute substantial evidence which support his conviction of felony stalking." (*Ibid*.)

We now turn to the facts in this case.

2. *There was substantial evidence of Wynne stalking Knox.*

Wynne argues that there was not substantial evidence to support the crime of stalking separate from the threats charged in the criminal threats counts. Further, Wynne characterizes his conduct toward Knox as "expressing inappropriate affection, not threatening her."

Contrary to Wynne's contention, there was evidence of a continuous course of conduct of stalking as to Knox during the period from August 25, 2009 to November 11, 2009, as charged in counts 3 and 4, excluding the October 19 and November 11, 2009 criminal threats. Knox had obtained a restraining order against Wynne on October 25, 2007, which remained in effect as of August 25, 2009. During this period Wynne continued to contact Knox by phone and letters, with his communications becoming increasingly sexual. He repeatedly said he loved Knox, planned to see her when he got out of jail, and knew where she worked. On August 26, 2009, Wynne came to Knox's office in Van Nuys looking for her, and was arrested for refusing to leave, making Knox even more fearful for her safety. She then obtained a permanent restraining order against him effective through September 2012.

Between November 6 and 11, 2009, Wynne left Knox over 30 voice messages, saying Knox was responsible for his situation and that she had to get him out of jail. Wynne talked about his cousin who he claimed was a Navy SEAL and knew martial arts. At one point he called Knox pretending to be "Timothy," and told her that she was driving Wynne crazy by getting a restraining order, and that Wynne wanted to give her "punishment" by fighting her in a boxing ring.

Similar to the conduct in *Halgren* and *Uecker*, this conduct of repeated harassment and credible threats placed Knox in reasonable fear for her safety, and was sufficient to

21

support the stalking conviction in count 4. (See *People v. Uecker*, *supra*, 172 Cal.App.4th at pp. 594-595; *People v. Halgren*, *supra*, 52 Cal.App.4th at p. 1233.)

3. *There was substantial evidence of Wynne stalking Stuhlbarg and Norene.*

As to the counts pertaining to Stuhlbarg and Norene, Wynne argues that other than the three letters that supported the criminal threats convictions, "there was little to establish any real basis for concern." However, apart from those three letters, Wynne sent many other letters from jail and made hundreds of phone calls to Stuhlbarg and Norene, expressing dissatisfaction with their services and demanding that they meet him and give him money.

At some point in late 2009 or early 2010, Wynne came to their office, charged inside, pushed Norene aside, sat down and refused to leave. His actions scared Norene, Stuhlbarg and the office staff, and Norene called the police, who escorted Wynne out of the office. On January 3, 2010 Wynne wrote: "I seriously contemplate actually killing you half of the time because, half of the time, you act incompetent or lazy, and if you don't want to do a great job as trustees, then let me know. I can get rid of you and hire someone else." He also wrote: "What I really want to do is beat your mother fucking asses so bad because you don't listen and you just keep ignoring me." On February 12, 2010, Wynne wrote that he would come to their office after he was released.

Wynne wrote to Stuhlbarg on March 16, 2010, telling her to "[s]end my money order today, you mother fucking bitch." He told her, "I will be getting new trustees to replace you, and you will be put in jail, you piece of shit, mother fucking bitch, fuck you." He told her to stop avoiding him and added, "I will be at your office when I get out, you fucking bitch."

Wynne's letters and hundreds of phone calls demanding money, his discussion of killing or beating Stuhlbarg and Norene, his threats to come to their office and his actual appearance and pushing Norene at the office constituted substantial evidence of stalking. (See *People v. Uecker*, *supra*, 172 Cal.App.4th at pp. 594-595; *People v. Halgren*, *supra*, 52 Cal.App.4th at pp. 1230-1231, 1233.)

**C. *The Trial Court Was Not Required To Stay Wynne's Stalking Convictions Under Section 654***

Because there was substantial evidence of Wynne stalking Knox, Stuhlbarg and Norene separate from the charged criminal threats, substantial evidence also supports the trial court's implied finding that Wynne's intent and objective in making the criminal threats was separate and independent of his intent in stalking his victims. Therefore the trial court properly found that section 654 did not bar sentencing on Wynne's convictions for stalking and making criminal threats. (See *People v. Perez, supra,* 23 Cal.3d at pp. 553-554; *People v. Ortiz, supra,* 208 Cal.App.4th at p. 1379; *People v. Moseley, supra,* 164 Cal.App.4th at p. 1604; *People v. Felix, supra,* 92 Cal.App.4th at p. 915.)

**DISPOSITION**

The judgment is affirmed.

FEUER, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.